Good morning. May it please the court, Jonathan Libby appearing on behalf of appellant Prince Will Isu. Your honors, very simply, the district court's loss calculation in this case was wrong. In establishing facts, including approximations underlying the sentence, a district court is... We're talking about 15 months difference here. Do I have that correct? Well, obviously, post-Booker, we don't know what the difference possibly could be. The difference in the guideline range is... 63 to 68. It was 63 to 78, and it would be 51 to 63. Libby, in light of Judge Lett's emphasis during your last hearing before him, I guess it would be the resentencing, in which he indicated that what really drove the sentence in this case was the vulnerable older victims and your client's misuse of his disability in order to gain sympathy to get the victims to part with their money. And in this post-Booker world, does it really matter whether or not he erred in the loss calculation where he made it very clear that that wasn't a factor that was driving the sentence in this case? Well, I mean, the short answer is, of course it matters, because this court in Rassam and in Cardi, the Supreme Court in Booker and its progeny have all made very clear the first thing courts have to do is accurately calculate the guidelines, and that is the starting point in any analysis. From the standpoint of clear error, do we not? Clear error in terms of the court's calculation of the loss, correct. It's not de novo. It would be de novo only in terms of whether the court correctly calculated the guidelines, but the facts underlying that would be clear error. So in terms of calculating the amount of loss, that would be very difficult. And he based his calculations largely on the checkbook entries. Is that correct? Well, there were two components of loss here. In the first component, what the court did was it took everything that was in Mr. Isu's bank account, all of the deposits into that account were counted as loss, even though as the government concedes, it only had proof of $166,000 of that $278,000. And no other means of support. Well, that's right, and that's in the first component. In the second component, that deals with Mr. Vaughn's checks, where the court essentially took Mr. Vaughn's word for it, that he had all of these checks that were written, but the government concedes they only have proof, I believe, of $166,000. I don't have that figure right in front of me. I'm sorry. They couldn't — there was $114,000 that the government concedes they could not prove of Mr. Vaughn's losses. Now, you can take either — take away $114,000 that they didn't have proof from Mr. Vaughn's losses or the $114,000 that they didn't have proof from the first losses. You only have to get down $88,000 to get a reduction in his guideline calculation. Are you saying you had no burden of going forward with any evidence to rebut what the government showed as the loss amount, based on Vaughn's checking account? Correct. Once we objected to that loss and said, we do not agree that that, in fact, is an accurate calculation, then it was, in fact, the government's burden to produce reliable evidence to support their contention. They didn't do that here. But reliable evidence only has to be, does it not, by a preponderance of the evidence? That is correct. So if they — let's assume, for the sake of my question, that they met the preponderance standard and the defendant stands mute or simply says, I object, I disagree, that's not right. Has he done anything to undercut the fact finder's determination that the evidence established by a preponderance this particular loss calculation? I mean, I suppose in that generic context, then, no, I mean, he hasn't undercut it. And what more did Mr. Isuzu do here? Well, he does object, and that's the difference from what you just suggested. You just conceded that if, in my hypothetical, that if all the defendant does is say, I object, that might not be enough. And my question for you is, besides object, what did Mr. Isuzu do here? Well, then I misinterpreted your example. I'll let you withdraw your consent. Thank you. No, I mean, once — and this Court's decision in Snipe makes very clear. If the defendant objects, then the government has the burden. They can't just simply rely on what the government says it is or what the PSR says it is. Okay, but my hypo was, let's assume that what the government showed, which may have been all they had in the bank's loss of the records, et cetera, et cetera, is what we have in the record, and that's enough to meet the preponderance of the evidence standard. Doesn't the defendant have to do something in order to tip the balancing of the evidence back below, I'll call it the zero line for want of a better term, in order for us to declare that the district court was clearly erroneous in its balancing of the evidence? Well, again, I think the government at all times has the burden to bring forth sufficient, reliable evidence. Let me try the scales of justice, all right? Okay. The government puts enough evidence so that it tips to the preponderance of the evidence standard, but the defendant offers nothing to change it. Well, if — At this point, can't we conclude that's good enough? If you conclude that there was enough evidence, certainly. And it's our position that there certainly — there was just not enough evidence. As the government concedes, they didn't have the proof to back this up. They're essentially guessing. I mean, in the first calculation, in terms of — Mr. Vaughn's account was some evidence. That's — his check register was evidence. Right, which is essentially — it was his — it was his word, his recollection, based on what he had written down in his check register. That's — It's evidentiary. I mean, you can hear for what it's worth, but it's there. Well, here's the concern, and it's a concern in terms of double-counting. In the court's — in the first component, where the court just counted everything that was deposited into Mr. Easley's account, they took away $61,000, saying, we know that those are checks from Vaughn. So we're not going to count that. All right? But there's $114,000 in Vaughn checks that we can't identify. Now, if there's — what if that $114,000 was, in fact, among those deposits, which they also can't identify $114,000 from? I mean, it's interesting that there's $114,000 in Vaughn checks that cannot be found and $114,000 in the totals. I can't hear you on the numbers, but didn't Mr. Vaughn say, look, over the period, I gave Mr. Isuzu $237,000? That's correct, and that was all considered by the court in the calculation. That's right. Why isn't that evidence that Judge Letts could consider in arriving at the loss calculation? Well, he can consider it, but, again, it comes down to, is it enough to take his word for it? Well, at this point, it's unrefuted. Well, we're refuting it, and in fact — There's a difference between objecting and refuting, and I don't see any evidence of refutation here. I see lots of objection, but I don't see refutation. Well, what we're suggesting is they can't prove $114,000. All right? And if, in fact, those deposits are made into Mr. Isuzu's account, which they concede also they can't determine where $114,000 in this account came from, then the only, I think, reasonable inference from that is the $114,000 that they can't prove in the second component is the same as the $114,000 from the first component, and if that's the case, they counted $114,000 twice. But the timing is all wrong for that argument. I respectfully disagree, Your Honor. Well, the checks and bonds checklist that are not accounted for elsewhere date from September 12, 2000 to January 16, 2000, and the deposits in 93-97 began only in late December 01. That's true. So it would be very difficult to get $114,000. Well, except, well, the total in the account then went over a two-year period, and, again, the government hasn't produced the records so that we can actually see how much money was deposited when. We don't know. Mr. Libby, was there anything other than, what was it, a $10,000 or $14,000 deposit from his winnings at the bicycle club to explain any other, I'll call it, legitimate source of income? Well, there were also his wife's paychecks were deposited into the account, which the government now concedes shouldn't have been counted, even though the court did include that in the calculation. Does that make a difference in terms of the $400,000 level? It wouldn't, but, of course, again, it would not. It would not, certainly. But we, of course, don't know about the other $100,000-plus where we don't know where it came from. Back to the lack of reputation. Fair enough. Giles, your time has expired, but I do have a question. Sure. If you prevail here and the applicable range is 51 to 63, and, of course, keeping in mind the factors that will be applied, and Judge Letts resentences at 63, are you going to be back here again? We wouldn't. I don't expect we would be. Mr. Isu's release date is January of 2012, so if, in fact, there was a reduction of 15 months, then. . . No, no, no. I say you got. . . he was sentenced to 63, was he not? He was sentenced to 78. He was sentenced. Excuse me. He was sentenced to 78, so this would reduce to 50. It would reduce by 50 months, and, in fact, he would be ready to be released pretty much in the next couple months. All right. I stand corrected. Thank you. We'll hear from the government. May it please the Court, my name is Ellen Lindsey. I'm an assistant United States attorney in Los Angeles. I've lived with this case from the beginning, down, up, down. At least you get to drive out to Pasadena. It's so pretty out here, and I get to see my old friends who used to be at our courthouse. Your Honor, I hope you won't think me the rudest attorney ever, but the defendant is not Anisuzu Carr. His name is Isu. Isu. Yes. I stand corrected, and I thank you for the correction. I obviously agree with the comments of the panel, and most specifically, Judge Lefkoe, you are correct that there is a sort of a block of checks for Mr. Vaughn that we don't have the backup documents for, and it couldn't be double counting with the missing records from Mr. Isu's account. At least just a tiny, tiny amount could be because the timing is just completely off on that big block. There are a couple of checks, maybe less than 10, that overlap, so double counting would not account for the amount. I just wanted to emphasize that as far as Mr. Vaughn's register, there is corroboration, in that he states that he was solicited by the same person, gave to the same charities, and there's no reason that he would have falsified his own check register, and to me this is exactly like the case of United States v. Blitz, where it was the sort of the ledger of sales that accounted for the loss, and the defendant here argues that it's distinguishable because in that case it was the defendant's ledger, and in this case it's the victim's ledger, but this court in Blitz was not at all focused on whether it was a defense quote-unquote admission. It was all about the reliability of those records, and the fact that just because it was written in the ledger didn't mean that the victim actually followed through and sent the check or that the check didn't bounce, but regardless of that, it was a sufficient document, and Mr. Vaughn's check register is virtually the same, if not more reliable, because it corresponds to his own testimony. And I would just like to state again that the corroboration for the fact that the unfound checks in the bank account, in defendant's bank account, would be proceeds of the fraud, is that every single check that we do have going into that account, with the exception of these four very small checks for Mrs. Isu's employment, they are in charitable names, and that the unrefuted evidence is that that is by nature fraudulent, because in this type of telemarketing, it is wholly inappropriate to deposit the checks into the fundraiser's account. The checks are supposed to go to the charity, and then the person is to be paid, and furthermore, in the pre-sentence report, the defendant admits that he had no other source of income, other maybe than some gambling, although there was actually no real evidence of that. It was just counsel's argument. Also, as I said, there are no expenditures for any kind of charity. So it's just like the Scrivener case, and the defendant states, well, in the Scrivener case, we knew that all the calls were made to victims, but that's not true. It was 22 known calls, and then the supposition was that calls from that calling card to anybody else were victims. So it's very much the same as here. And unless the court has any other questions, I will submit. No further questions. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. All rise. The court for decision is adjourned.
judges: Lefkow, O'scannlain, Tallman